21-2227USA v. Yue Xue USA v. 21-2228USA v. Yue Xue USA Your Honor, I've never seen a case that includes as an element intent to cause pecuniary or economic harm to a victim. To the contrary, the trade secret theft statute refers only to injury. And the Seventh Circuit in Pew, which Judge Fuentes' opinion in free relied on in holding essentially in the bankruptcy fraud context that there's no inherent intent to cause loss, Pew expressly rejected that argument. It said, nowhere in this statute is there an element that says intent to cause economic harm. And other courts have considered other types of harm than economic harm that can be caused here. So for example, Pew cites to the Jin case in saying it could be a harm and intent or knowledge of an injury just if it got out that GSK arguably doesn't protect its trade secrets very well. Or perhaps there could be an injury hypothetically where someone takes a trade secret with intent to learn from it and puts that company at risk because they might leave it at the public library for someone else to find. There are many types of injury that could be in play here that are not the particular one required by application note 3A2. I think part of the problem that the government has is from a policy point of view that if we affirm that we'll be sending a message to trade secret thieves that they have little to fear from the US justice system that as long as they can show that they didn't intend necessarily harm to the victim, the party from whom they took the secrets, it's gonna be a low sentence. And the import of that is not going to be good. That's as I understand the policy argument. Well, your honor, respectfully, our client shouldn't be entitled, subjected to an unfair sentence because of policy arguments. The application note says what it says, which is that there has to be intent to cause pecuniary harm. And I'll take it a step further, which is that the other side of the coin from your honor's example is that if the court were to set aside application note 3A2, which we think would be incorrect, and reach a ruling that automatically our clients are gonna be subjected to the same treatment as someone who actually intends to cause a billion dollar loss, then someone who actually is taking this information would have every incentive to try to harm the other company, try to profit off it, try to compete against them and steal their market share. Because they're gonna be treated the same as someone who's just trying to learn some information. I assume that I'm gathering your response is, look, that's something to take up before the Sentencing Commission and there's a whole lot of arguments against the Sentencing Commission never doing anything other than what is currently done. Absolutely, your honor. And I would add to that that I don't think it's a very persuasive policy argument anyway for the reason I just articulated. One other. Counsel, your time is done. I think your adversary is gonna, I'm sorry, your friend is gonna be, you're all friends, but. Mr. Joseph, I think, is about to up. Thank you. Thank you, your honor. Thank you, your honor. Sure. Your honor, my name is, may it please the court, my name is John Joseph. I represent Dr. Tao Lee. And I'd like to start off, Judge Shigaris, with addressing your question. Is there overlap? There is none. At joint appendix page 726, which is from the transcript of the direct testimony. Pardon, what page? The joint appendix 726. Great, thank you. It's the testimony of Dr. Field. Dr. Field is the tenured, 25-year tenured pharmacology professor at the University of Pennsylvania Medical School. One of the best medical schools in the country. It's been the leading recipient of grant money from the NIH for 20 years. Dr. Field is very experienced in creating, growing, designing monoclonal antibodies, which is the subject of this case. He reviewed all the documents in this case. And he specifically reviewed the marketing materials. And at line 24, on page 34, he was asked, now I asked you to review all of the marketing materials and business plans in this case. Did I not? Answer, yes. And after reviewing those marketing materials and business plans, do you have an opinion as to whether they reveal any trade secret or confidential information regarding the MAB platform or the DAB platform or the ADC platform for that matter? Answer, no, there's none. I think you're asking for the ADC platform or all three platforms, all three. No. So just so we're understanding that factual, there is no overlap. The marketing materials, which touted access to some information to try and get credibility with investors, was not trade secret. It wasn't even confidential. It was in the public domain. Was there a misrepresentation of whose it was? Yeah, but that doesn't harm GSK. So in effect, it was puffery. It was total puffery. And Dr. Lee told the FBI agent, in the initial two hours of this case, in January of 2016, exactly what happened. They were hand-in-handedly trying to start this company. They got some information about background, because these people weren't antibody scientists. And they got a hodgepodge of materials to give them the nomenclature and the feel of these documents, what they look like. And then they never used them. They didn't investigate any drugs that GSK researched. They researched their own drugs. There are conversations in electronic communications that were collected by the government that happened before the government even started their investigation, where they say, we don't want to violate patent laws. We don't want to have copyright troubles. We don't want to take these molecules from GSK. This is strong indicia of intent. This isn't to say that they didn't commit a crime. You seized them on the right issue. The statute requires an injury. And it only requires a knowledge of the injury. That is drastically different from Application Note 3, which requires specific intent to harm. And it has to be pecuniary. Knowledge in the statute doesn't cut it as far as intentional harm. There's no parallel there. And I would add that the government never made this argument in any point in this case until it was on appeal. They never used the, you can judge Shigeris, you can use your F4 control, F function, and look for pecuniary, specific intent, seeking pecuniary harm, won't find it in any of the government's submissions to the court, in the district court, not there. The issue of injury was brought up by Judge Slomski, not the government. When the government was asked to make its proffer of what the facts they were going to prove in that case, the government said they sold this information and for the benefit of themselves and Reno Pharma. Made no mention of injury to GSK, none. Judge Amber, you're quite right. They are inviting this court to create a split. When really what's happened here is a very, this is a garden variety case. There's a trade secret theft. The guidelines bake in a sixth level penalty for this crime. That includes an injury that's not pecuniary. And I would argue, Your Honor, that this notion that the loss of exclusive possession is, I would say it's a harm. I would say it's certainly not a pecuniary harm. Pecuniary harm is defined in the application note as readily measurable money damages. Whether, GSK witnesses testified at the hearing that they didn't lose access to this information. They were able to profit from this information. They were able to research this information. They were able to sell this information. They lost no ability to use this information. They didn't even know they had lost sole possession. That is not a quantifiable, measurable injury. And therefore, it doesn't satisfy the application note. And as to the government's argument that somehow the judge is supposed to glean what these trade secrets are worth, the government's expert on damages, on loss, she didn't even produce an estimate on loss. She produced what's called an indication of value. And basically what she did was through every cost that GSK had in their cancer research program into a pot for decades and came up with a billion dollars. He didn't segregate out the trade secrets that were stolen. And that's not what, our clients are accountable. If we meant to steal them and we meant to use to cause pecuniary harm, none of which has been proven that we meant to do that, the government can only get what the trade secrets are worth. And instead of the trade secrets, they basically alleged everything. And our expert testified that that's akin to accusing someone who stole a trade secret regardless of the component in a car radio with the entire design, manufacture cost of a luxury vehicle. That's what they did. And now they want, they're saying that the judge's legal error here is that he didn't come up with the answer. The government didn't give him the answer. The government gave him no way to figure this out. They just said their cancer program cost $2 billion for the last 20 years. And that's what the harm is. Skipping over all of the requirements to prove subjective intent, they didn't even give the judge a way to value what the trade secrets are worth in this case. So you would say our Kirshner case is pretty important? I'd say the Kirshner, all your cases, Diallo, Kirshner, Free, with Seitz-Pugh, they're all directly on point. They're indistinguishable. And as far as the message, Judge Ambrose, you'd have to talk to my client. My client's life is shattered. Went to jail. His life's ruined professionally, emotionally. And I'm not playing a violin here, but this was not a sentence that was anything, any scientist, anyone who spent their life trying to become a PhD to cure cancer, this is nothing that anyone would take lightly. And it's commensurate with other cases that were sentenced for people who did have the requisite intent to harm their victim. It's commensurate with that. Well, we're not here to apply a boy or a girl. I'm not. I'm not. I'm applying an enhancement. Understood. And I think you're quite right that if Judge Slomski was offended to a point that these people needed to go to jail longer, he had ample means to do that outside the guidelines. Were they represented by counsel at the time that a plea was entered? Yes. And they pled guilty. Correct. And the guilty plea was to conspiracy, to steal trade secrets. One count. One count. That's a crime. That's a crime. But you say that, nonetheless, the government did not prove its case? I'm saying that the government did not proffer this injury component. That it was up to the judge. Judge Slomski went over it. They didn't proffer in there when the judge gave the floor to him. If you engage in a conspiracy to steal something, but it's not effectuated at the end, isn't there a criminal element there with the intent to steal? My point, I was addressing the part of the statute that requires an injury. That's what I was addressing, Judge Fuentes. Now this shift, moving of the goalposts to, oh, the harm here is that there was this non-exclusive ownership. And that's injury. And so we don't have to prove that. That was never even mentioned in the change of plea, except by Judge Slomski. And I think the problem with that is it doesn't get them where they need to be. Because the court needs to do this deeper analysis under Kirshner to look to see, was there a specific intent to cause pecuniary harm to GSK? There was none. And the judge found that. And that judge's opinion is entitled to due deference. He sat through the three-day hearing. He spent over a year on this opinion. This was not a lightly done opinion. And I think it's due deference. And I would ask that the judge's opinion be affirmed. Thank you. Thank you. Thank you. And we'll hear from the government. I want to start with the issue of overlap. That was certainly an issue that is a factual dispute between the parties. But the government's the appellant here. So let's just assume the defendant's case is correct and that there is no overlap. That's irrelevant for the guidelines consideration. Consider a situation where, let's say, I steal Ford's trade secrets in terms of how they streamline their vehicles. And I use that to, say, I have an airplane company. And I use their trade secrets to build a better airplane. Ford's not in the airplane business. But I still stole their trade secrets. And those trade secrets have a value. It's intellectual property that can be valued. Even though Ford suffered no losses at all, that still can be valued in the sentencing guidelines. And that actually came up, I think it's the Chang case. It's the Boeing case out in, I think it was the Ninth Circuit case, which the defendant in that case, they stole something. Boeing had no competitors for this particular product. There was no chance they would ever lose any market share or any loss whatsoever. But there was still a fraud loss in that particular case. So this issue in terms of overlap, judges, I would submit to you is a red herring. And it's irrelevant to the guidelines analysis. There's no question that determining the fraud is important. What sentencing were you asking for Ms. Ushuai? Yeah. So even if the district court had agreed to our guideline numbers, obviously the guidelines would have recommended life. We agreed that this was not a guidelines case. The plea agreement that we negotiated was that we would not recommend more than 10 years for Ushuai. And I believe my recollection is that was what our recommendation was to the sentencing judge. And she ended up getting, what, eight months? Eight months, correct. And three-year supervised release. Correct. There's no question that this was a difficult task for Judge Slomski to calculate this stuff. And that's one of the reasons, in terms of the fair market value, and that's one of the reasons why the people who wrote the sentencing guidelines, they put a lot of time, effort, and thought into this. And because the damages, because the pecuniary loss, actual pecuniary loss, is very difficult to prove in these cases, that's why the guidelines allow for development costs. At sentencing, did the government take a position as to the value of the intended loss? A billion dollars. A billion? More than a billion dollars, actually. If the district court concluded it was zero, that's a big difference. It's like a home run or a strikeout. Correct. And that's one of the reasons why we're here today. And really, from our perspective, we're here because the district court failed to calculate the value. Even though the district court, in its opinion, admitted that these documents, that this intellectual property had value, it failed to calculate that. The zero suggests to me that the district court did take a look at the loss and determine there was no loss. There was no intended loss. No intended loss. But your position is that there was a loss. That there was intended loss, absolutely. And there was a loss. Intended loss. Correct. But no actual loss. Well, in terms of the actual loss to GSK, in terms of dollars out of their pockets, no. There is no loss in terms of dollars out of the pockets to GSK. All right. Well, thank you, counsel. Thank you. We'll take this case under advisement. We'll ask that the parties order a transcript of this very interesting case and split the cost of the transcript.